IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| NATHANIEL DAVID MARCH, | ) | CASE NO.  1:25-CV-01428-DCN |
| | ) | |
| Plaintiff, | ) | |
| | ) | JUDGE DONALD C. NUGENT |
| vs. | ) | UNITED STATES DISTRICT JUDGE |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | MAGISTRATE JUDGE |
| SECURITY, | ) | JONATHAN D. GREENBERG |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| | ) | |

Plaintiff, Nathaniel March ("Plaintiff" or "March"), challenges the final decision of Defendant, Frank J. Bisignano,[1] Commissioner of Social Security ("Commissioner"), denying his applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.  For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

## I. PROCEDURAL HISTORY

In June 2024, March filed an application for POD, DIB, and SSI, alleging a disability onset date of July 1, 2015 and claiming he was disabled due to "autism, chronic pain, soft tissue damage in joints, on crutches, ADHD, chronic fatigue, hypothyroidism, depression, arthritis, anxiety." (Transcript ("Tr.") 87,

---

[1] On May 7, 2025, Frank J. Bisignano became the Commissioner of Social Security.

1

88.)  The applications were denied initially and upon reconsideration, and March requested a hearing before an administrative law judge ("ALJ").  (*Id*. at 160, 165, 180, 184, 187.)

On March 4, 2025, an ALJ held a hearing, during which March, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id*. at 48-86.)  On March 12, 2025, the ALJ issued a written decision finding March was not disabled.  (*Id.* at 17-43.)  The ALJ's decision became final on May 22, 2025, when the Appeals Council declined further review.  (*Id*. at 1.)

On July 8, 2025, March filed his Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 6, 7, 8.) March asserts the following assignments of error:

1.  The ALJ erred when she failed to find that the findings of the Functional Capacity Evaluation were persuasive.

2.  The ALJ erred when she failed to support her conclusions or discuss supportability or consistency when she evaluated the opinions of the treating source.

3.  The ALJ committed harmful error when she failed to properly apply the criteria of Social Security Rule 16-3p.

(Doc. No. 6 at 1.)

## II. EVIDENCE

### A.      Personal and Vocational Evidence

March was born in 1981 and was 43 years-old at the time of his administrative hearing (Tr. 87, 50, 34), making him a "younger" person under Social Security regulations.  *See* 20 C.F.R. §§ 404.1563(c), 416.963(c).  He has a high school education.  (Tr. 34, 56.)  He has no past relevant work.  (*Id*. at 34.)

2

**B.      Relevant Medical Evidence[2]**

On January 24, 2023, March presented to Alternative Paths via telephone for a medication management appointment. (*Id*. at 659.) He self-diagnosed himself with ADHD and autism. (*Id*.) Clinical diagnoses at this time included PTSD, social phobia, alcohol abuse in remission, and cocaine abuse in remission. (*Id*. at 661.) Mental status examination revealed he was oriented, with coherent speech, appropriate language, coherent thought process, normal thought content, no hallucinations, appropriate fund of knowledge and cognition, intact memory, appropriate attention span and concentration, and fair insight and judgment. (*Id*. at 660.)

On March 1, 2023, March presented for a follow up visit due to right knee pain. (*Id*. at 923.) He expressed interest in having surgery. (*Id*.) On examination, he experienced tenderness in the medial joint line, otherwise the exam was unremarkable. (*Id*. at 924-5.) He was diagnosed with an ACL and meniscus tear. (*Id*. at 925.)

On April 25, 2023, March presented to orthopedics with complaints of left hip pain. (*Id*. at 911-12.) Physical examination was unremarkable. (*Id*. at 914-15.) Impressions included left hip acetabular labral tear, femoral acetabular impingement, early degenerative changes, right distal bicep rupture, and right ACL rupture. (*Id*. at 915-16.)

On December 25, 2023, March completed Function Report – Adult. (*Id*. at 365.)

On December 28, 2023, March presented for counseling at Infinity Counseling, LLC. (*Id*. at 679.) His medical problems were described as "chronic inflammation, osteoarthritis, possible alers [sic] Danos syndrome, possible fibromyalgia, chronic infection, connective tissue disorder, neuropathy, concussions." (*Id*. at 680.) Mental status examination revealed neat appearance, normal speech and eye contact, restless

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

motor activity, full affect, euthymic mood, short-term memory impairment, distracted attention, no hallucinations, suicidality, homicidality, or delusions, cooperative behavior, good insight, and fair judgment. (*Id*. at 682-83.) Diagnoses included autism, ADHD, and PTSD. (*Id*. at 688.)

On December 29, 2023, March presented for a follow up visit for his bilateral distal bicep injuries and repair. (*Id*. at 749.) Physical exam revealed he ambulates well with no other joint abnormalities noted, range of motion was intact for all joints, 5/5 strength in flexion and 4/5 in supination on the right side, and 5/5 strength on the right side. (*Id*. at 750.) Imagining revealed a rupture of the left bicep tendon. (*Id*.)

On January 3, 2024, March presented to Dr. Suneja with complaints of headaches. (*Id*. at 742.) Further testing was ordered, he was started on medication, and advised to make lifestyle modifications. (*Id*. at 747.)

On January 31, 2024, March presented to Dr. Li with complaints of "neuropathy and muscle weakness." (*Id*. at 708.) The impression was likely fibromyalgia. (*Id*. at 712.) On examination, March had normal muscle strength in both arms and hands, normal heel-toe walking, gait, and ability to tandem walk. (*Id*. at 711-12.) Mental status examination was unremarkable. (*Id*. at 710.) March sent a MyChart message to his provider, asking for his visit notes to reflect he never feels "pretty okay", has chronic fatigue, and was diagnosed with Hashimoto's in 2021. (*Id*. at 709.)

On February 2, 2024, March presented for a follow up visit. (*Id*. at 705.) He reported doing well following knee surgery that occurred in October 2023. (*Id*. at 706.) He reported attending four physical therapy appointments but doing exercises at home. (*Id*.) He denied calf pain, numbness, and tingling. (*Id*.) He had normal gait, reflexes, sensation, and normal range of motion in his knees. (*Id*. at 707.)

On March 6, 2024, March presented for an appointment due to pain. (*Id*. at 1199-1200.) He was referred to the Chronic Pain Neuro-Rehabilitation Program. (*Id*. at 1204.) He asked to be placed on the waiting list to receive ketamine infusions. (*Id*.)

On March 7, 2024, March presented for a Functional Capacity Evaluation. (*Id*. at 1230.) Dr. McDonald opined March could perform work within the sedentary demand category. (*Id*.) During the evaluation, March could lift twenty pound to below waist height, ten pounds to shoulder height, and carried ten pounds. (*Id*.) He pushed and pulled 22 pounds of force and had 4+/5 and 5/5 strength in his arms and legs. (*Id*. at 1235.)

On March 12, 2024, March presented for a new evaluation of right knee pain. (*Id*. at 1219.) He was provided an injection to treat the pain. (*Id*.)

On April 11, 2024, March presented for a psychological evaluation. (*Id*. at 1304.) The physician opined he had no depression and did not meet the criteria for other discernable disorders. (*Id*. at 1309.) the physician noted deficits in attention, and thought "the relationship between [his] physical and emotional symptoms is likely bidirectional" and he would benefit from treatment. (*Id*.)

On April 17, 2024, March presented for a psychological evaluation. (*Id*. at 1288.) Mental status exam was generally unremarkable. (*Id*. at 1291-92.) He appeared mildly limited in judgment for confronting simple circumstances in daily life and understand what is expected. (*Id*. at 1292.) His insight, behavioral control, and ability to understand how his behavior affects others were mildly or somewhat limited. (*Id*.) Diagnostic impressions included PTSD, ADHD, and histrionic and antisocial traits. (*Id*.)

On July 8, 2024, March presented for a pain management medication evaluation. (*Id*. at 1331.) He was assessed with chronic pain syndrome, chronic diffuse pain, ADHD, knee pain, left hip pain, and neuropathy. (*Id*. at 1332.)

On August 1, 2024, March attended a cognitive and behavioral group focused on coping with chronic pain. (*Id*. at 1421.)

On August 9, 2024, March completed another Function Report – Adult. (*Id*. at 550.)

On October 13, 2024, psychologist Dr. Holmes, of Kenneth A. De Luca & Associates, Inc., completed a Psychological Evaluation Report. (*Id*. at 2094.) The report was based on evaluation dates 6/1/2024, 7/10, 2024, 7/24/24, and 10/14/24. (*Id*.) March requested the evaluation due to concern about his social and emotional functioning. (*Id*.) Diagnoses at this time included PTSD, ADHD, Autistic Disorder, Generalized Anxiety Disorder, and Depressive Disorder. (*Id*. at 2102.) Dr. Holmes noted March was cooperative, overly talkative, showed no signs of anxiety, attempted to be personable and pleasant, and struggled to understand boundaries. (*Id*. at 2094.) His thought process and content were generally normal. (*Id*.) He had a full-scale IQ of 115, placing him in the high average range. (*Id*. at 2097.) His working memory and process speed were in the average range. (*Id*.)

On January 3, 2025, Dr. Mancini completed a Mental Impairment Questionnaire. (*Id*. at 2088.) He opined March would miss two to three days of work per week and would be off task fifty to one hundred percent of the time. (*Id*. at 2089.) On the same day, Dr. Mancini completed Physical Medical Source Statement. (*Id*. at 2090.) He wrote, "see functional capacity evaluation." (*Id*. at 2091.)

On February 12, 2025, Dr. Linnean completed a Physical Capacity Evaluation. (*Id*. at 2248.) Dr. Linnean opined March could perform work at the sedentary demand level. (*Id*. at 2249.) Dr. Linnean did not provide any clinical evaluation results. (*Id*.)

## C.    State Agency Reports

### 1.    Mental Impairments

On May 5, 2024, Jeannine Abbott, PhD., reviewed the claim file and found there was insufficient evidence for the Title II claim due to a date last insured of December 31, 2016. (*Id*. at 97.) March continued to work and was insured through June 30, 2025. (*Id*. at 17.) Dr. Abbott's findings for the purpose of the Title XVI claim now also addresses the period relevant to the Title II claim with the updated date last insured. Dr. Abbott opined March has no limitations in understanding or memory, the ability to carry out short and

6

simple instructions, carry out detailed instructions, perform activities within a schedule, maintain regular attendance, and be punctual, sustain an ordinary routine, and make simple work-related decisions. (*Id*. at 103.) Dr. Abbott found March is not significantly limited in his ability to maintain attention and concentration for extended periods, work in coordination with or in proximity to others without being distracted, complete a normal workday and workweek without interruptions from psychologically based symptoms and perform at a consistent pace. (*Id*.) Dr. Abbott wrote March can "interact with the public, coworkers, and supervisors superficially and occasionally in situations that do require conflict resolution or persuading others to buy products or services." (*Id*.) Dr. Abbott found March can adapt and manage himself in a structured and predictable work setting, where changes can be explained in advance. (*Id*. at 104.)

On August 26, 2024, on reconsideration, Valerie Budervic, PsyD., affirmed Dr. Abbott's findings. (*Id*. at 140.)

### 2. Physical Impairments

On June 18, 2024, Leon Hughes, M.D., reviewed the claim file and opined March could occasionally lift and/or carry twenty pounds, frequently lift and/or carry 10 pounds, push or pull in upper extremities without restriction, limitedly push or pull in lower extremities, stand or walk four hours in an eight-hour workday, sit for six hours in an eight-hour work day, occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, frequently balance, occasionally stoop, kneel, crouch, and crawl. (*Id*. at 101.) Dr. Hughes found March was limited in reaching in front or laterally in both arms, limited on the left in reaching overhead, handling, and fingering, and no restrictions in feeling. (*Id*. at 101.) Dr. Hughes opined March had no visual, communicative, or environmental limitations except for avoiding exposure to hazards. (*Id*. at 101-102.)

On August 23, 2024, on reconsideration, Bradley Lewis, M.D., affirmed Dr. Hughes findings. (*Id*. at 138-39.)

**D.** **Hearing Testimony**

During the March 4, 2025 hearing, March testified to the following:

• He was renting a room but is not homeless and has been homeless off and on since June 2024. (*Id*. at 55-56.) He earned his GED at age 15 and is considering taking classes at a community college. (*Id*. at 55.) In terms of benefits, he received SNAP, food stamp benefits, and Medicaid through the state. (*Id*. at 56.) He received goodwill donations through GoFundMe and CashApp. (*Id*. at 63.) He has a driver's license. (*Id*. at 69.) He had a roommate that he got along with but now he is being kicked out due to a dispute over toilet paper placement. (*Id*. at 69-70.) He was bullied in high school, but the teachers loved him because he would "participate in the learning and was smart." (*Id*. at 70.)

• He last worked two weeks ago performing handyman services. (*Id*. at 56-57.) He does this type of work once or twice a month. (Id. at 57.) He worked for Door Dash this year. (*Id*. at 57.) He had some self-employment income in 2023 from doing residential renovations. (*Id*. at 58.) At that time, he was able to lift 30-50 pounds. (*Id*.at 59.) In 2021, he worked for Rumble Construction doing similar work. (*Id*. at 59.) He worked as a project supervisor in 2020. (*Id*. at 60.) He lifted 30-50 pounds, sometimes more. (*Id*. at 61.) He has never been fired from a job. (*Id*. at 68.) He is "smart and capable of accomplishing skilled things" but feels burnt out due to pushing himself through pain which contributes to "social dysfunction." (*Id*.) At work, he was able to remember tasks from day to day. (*Id*.)

• He had knee surgery in 2023. (*Id*. at 63.) He has continued pain in the right knee. (*Id*. at 64.) He experiences weakness, pain, and instability in his left knee. (*Id*.) He occasionally uses a cane. (*Id*. at 65.) The cane is not prescribed; he made it. (*Id*.) He has neuropathy and connective tissue issues in his shoulders and arm, causing pain. (*Id*.) In his arms, he has weakness, numbing, and throbbing near his elbows and worse on the right side. (*Id*. at 65-66.) He sometimes has difficulty with buttons, zippers, and bathing himself. (*Id*. at 66.) He had a shower chair but now does not have a place to set it up. (*Id*. at 67.) Since 2023, he had "bouts with strep", injuries to his distal bicep tendons requiring surgery, and knee surgery. (*Id*. at 67.) He is prevented from working due to fatigue, pain, confusion, and socialization due to autism. (*Id*.) He has no difficulty interacting with others and gets along with "most good people." (*Id*.) He attended counseling but is not currently going. (*Id*. at 68.) He feels dizzy every day. (*Id*. at 70.) The last time he passed out due to lightheadedness was in 2023. (*Id*.) He can stand for twenty minutes to an hour, sometimes more, before he needs to sit down. (*Id*. at 71.) He can walk sixty to eighty feet before he needs to stop. (*Id*.) Reaching overhead causes pain and he can reach to the front and side. (Id.) He often drops things. (*Id*. at 72.) He takes all of his prescribed medications except for the antidepressant. (*Id*. at 73-74.) He intermittently wears braces on his knees. (*Id*. at 74.)

The VE testified March had past work as a house repairer and a supervisor carpenter.  (*Id*. at 77.)

The ALJ then posed the following hypothetical question:

> So for my first hypothetical, I'd like you to assume an individual, the claimant, same age, education, and work experience. This individual's [sic]

> able to perform light work as defined by the regulations, except they can occasionally push and pull with the bilateral upper and lower extremities. They can frequently balance, occasionally climb ramps and stairs, occasionally stoop, kneel, crouch, and crawl. They can never climb ladders, ropes, or scaffolds. This individual can frequently handle and finger with the bilateral upper extremities. They can frequently reach in front and laterally with the bilateral upper extremities. They can occasionally reach overhead with the bilateral upper extremities. No work around unprotected heights, moving mechanical parts or machinery and no commercial driving. This individual can understand, remember, and carry out simple instructions. No work that requires production pace such as assembly line work or work requiring hourly quotas. This individual can occasionally interact with supervisors, coworkers in the public, and they can do with occasional changes in the routine work setting. Given these limitations, could this hypothetical individual perform any of the claimant's past work is either actually performed or generally performed?

(*Id*. at 77-78.)

The VE testified the hypothetical individual would not be able to perform March's past work. (*Id*. at 78.)  The VE further testified the hypothetical individual would also be able to perform other representative jobs in the economy, such as marker, garment sorter, and classifier. (*Id*. at 79.) The ALJ asked:

> So I'm going to make one change to my first hypothetical. I'm going to leave it at light, but I'm going to say that the individual can't – so light is defined by the regulations except they can stand or walk for a total of four hours and eight-hour day and sit for the other four hours. All the other limitations that I indicated in my first hypothetical are going to remain except for I'm making this change to the standing and walking four hours in an eight-hour workday sitting for the other four hours. Given this change, would there be jobs in the national economy that this individual could do? And if so, could you provide me with a few examples, including the DOT code and number of jobs?

(*Id*. at 79.) The VE responded that the positions identified in response to the first hypothetical have a sit/stand options and would remain with the numbers provided. (*Id*.) The ALJ asked:

> So for my third hypothetical, I'm going to build off my second, so I'm going to keep it lightest defined by the regulation standard walk for a total of four hours and eight-hour workday. All the other environmentals are going to stay the same. All the other postural are going to stay the same except for

make one change. Now I'm reducing the ability to reach overhead to never. So this individual can never reach overhead with their bilateral upper extremities. Given this change, would there be jobs in the national economy that this individual could do? And if so, could you provide me with a few examples, including the DOT code and number of jobs?"

(*Id*. at 79-80.) The VE stated, "The three positions to [sic] identified the hypothetical one, there would be no overhead reaching with that position. It'd be at shoulder length lower." (*Id*. at 80.) The ALJ asked:

So for my fourth hypothetical, I'd like you to assume an individual the claimant's age, education, and work experience. Now I'm going to drop it down to a true sedentary. So sedentary is defined by the regulations, except the individual can occasionally push and pull with the bilateral upper and lower extremities, frequently balanced, occasionally climb ramps and stairs, occasionally stoop, kneel, crouch, and crawl, never climb ladder ropes or scaffolds. This individual can frequently handle and finger with the bilateral upper extremities. They can frequently reach in front and laterally with the bilateral upper extremities. They can never reach overhead with that left upper extremity, but they can occasionally reach overhead with that right upper extremity. No work around unprotected heights, moving mechanical parts or machinery and no commercial driving. This individual can understand, remember, and carry out simple instructions. No work that requires production pace such as assembly line work or work requiring hourly quotas. This individual can occasionally interact with supervisors, coworkers, and the public. However, interactions with others should be superficial, which I'm going to define as no tandem or collaborative work. No work that would involve sales negotiation, persuasion, conflict resolution, directing or supervising. And this individual could deal with occasional changes in the routine work setting. Given these limitations, would there be jobs in the national economy that this individual could do? And if so, could you provide me with a few examples, including the DOT code and number of jobs?

(*Id*. at 80-81.) The VE responded representative jobs include that of an ink printer, lens inserter, and patcher. (*Id*. at 81.) The VE testified that employers would tolerate no greater than ten percent of time off task, and no more than one absence per month. (*Id*. at 82.) March's attorney asked the VE why the jobs cited have frequent reaching overhead when the Judge indicated no reaching overhead. (*Id*. at 83.) The VE responded that based on his experience there is no overhead reaching in those positions. (*Id*.) The attorney asked about modifying the hypothetical to occasional handling or fingering, and the VE responded that the jobs would

10

be eliminated at both the sedentary and light levels. (*Id*. at 83-84.) The VE testified that changing the hypothetical to no interaction with the public would not change the representative jobs; they "are meant to be performed behind the scene." (*Id*. at 84.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if the claimant: (1) had a disability; (2) was insured when the claimant became disabled; and (3) filed while the claimant was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs*., 667 F.2d 524 (6th Cir. 1981).  To receive SSI benefits, a claimant must meet certain income and resource limitations.  20 C.F.R. §§ 416.1100, 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4)*,* 416.920(a)(4).  *See also Ealy v. Comm'r of Soc. Sec*., 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that they are not currently engaged in "substantial gainful activity" at the time of the disability application.  20 C.F.R. §§ 404.1520(b), 416.920(b).  Second, the claimant must show that they suffer from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c), 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has

a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. §§ 404.1520(d), 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent the claimant from doing their past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f), 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent the claimant from doing their past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), 416.920(g).

Here, March was insured on the alleged disability onset date, July 1, 2015, and remains insured through June 30, 2025, the date last insured ("DLI"). (Tr. 87, 19.) Therefore, in order to be entitled to POD and DIB, March must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1. The claimant meets the insured status requirements of the Social Security Act through June 30, 2025.

2. The claimant has not engaged in substantial gainful activity since July 1, 2015, the alleged onset date (20 CFR 404.1571 et seq., and 416.971 et seq.).

3. The claimant has the following severe impairments: Autism, Attention Deficit Hyperactivity Disorder (ADHD), Post Traumatic Stress Disorder (PTSD), Depression, Anxiety, Histrionic and antisocial traits, Obesity, Chronic pain, Soft tissue damage in joints, Chronic fatigue, Hypothyroidism, Polyarthritis, Osteoarthritis of right knee status post ACL repair 10/2023, Biceps tear in left upper extremity status post repair, Osteoarthritis of the right elbow, Tear of left hip, and Bilateral carpal tunnel syndrome (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except: He can stand and/or walk for a total of 4 hours in an 8-hour workday, and can sit for the other 4 hours. He can occasionally push/pull with bilateral upper and lower extremities. He can frequently balance, and can occasionally climb ramps and stairs, stoop, kneel, crouch and crawl. He can never climb ladders, ropes, or scaffolds. The claimant can frequently handle, finger, reach in front, and reach laterally with the bilateral upper extremities. He can occasionally reach overhead with the bilateral upper extremities. There should be no work around unprotected heights, moving mechanical parts or machinery, and no commercial driving. The claimant can understand, remember, and carry out simple instructions. There should be no work that requires production pace such as assembly line work or work requiring hourly quotas. He can occasionally interact with supervisors, coworkers and the public. The claimant can deal with occasional changes in routine work setting. He would be off task less than 10% of workday.

6. The claimant has no past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on May 23, 1981, and was 34 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has at least a high school education (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 404.1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569a, 416.969, and 416.969a).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 1, 2015, through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 19-36.)

## V.  STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the

14

Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI.  ANALYSIS

### A.  Opinion Evidence.

In his first assignment of error, March argues the ALJ erred by finding the first Functional Capacity Evaluation ("FCE") somewhat persuasive and that the record was more consistent with her own RFC than the second FEC. (Doc. No. 6 at 9.) March contends the ALJ incorrectly indicated that both FCEs were opinions from a non-treating source who is not a physician. (*Id*. at 8-9.) March contends this is incorrect because Dr. Mancini ordered both FCEs. (*Id*. at 9.) March argues the ALJ did not address consistency or supportability. (*Id*.) March claims the ALJ's rationale for "failing to adopt these FCE opinions was not supported by substantial evidence" because the FCEs are supported by and consistent with the medical records and treating physician Dr. Mancini adopted the same. (*Id*. at 10.)

15

In response, the Commissioner argues the ALJ properly evaluated the opinions of Drs. McDonald and Linnean. (Doc. No. 7 at 7-10.) The Commissioner claims the ALJ's conclusion that Dr. McDonald's opinion set forth in the March 2024 FCE was somewhat persuasive is supported by substantial evidence. (*Id*. at 7.) The Commissioner points out that Dr. McDonald's limitations were not supported by his own evaluation of March, who could lift twenty pounds below the waist, ten pounds to shoulder height, carried ten pounds, pushed and pulled twenty-two pounds of force, and showed 4+/5 to 5/5 strength in his arms and legs. (*Id*.) The Commissioner states the ALJ explained how Dr. McDonald's opinion was inconsistent with other evidence in the record, including his testimony he was lifting 30-50 pounds in 2023, working in home remodeling, lack of treatment from 2019-2021, and examinations in 2023 and 2024 that were generally unremarkable. (*Id*. at 7-8.)

The Commissioner claims the ALJ properly evaluated the opinion of Dr. Linnean when she found the lack of clinical examination notes or other evidence made it impossible for the ALJ to consider whether the examination of March supported her opinion. (*Id*. at 9.) The Commissioner states the ALJ considered consistency when she explained the opinion was inconsistent with the unremarkable medical evaluations and March's activities of daily living and work remodeling houses. (*Id*. at 10.)

In his reply brief, March argues the ALJ erred by finding the FCE's partially persuasive and failing to include the opined limitations in the RFC. (Doc. No. 8 at 2.)

In his second assignment of error, March argues the ALJ erred when she "failed to support her conclusions or discuss supportability and consistency when she evaluated the opinions of the treating source." (Doc. No. 6 at 11.) March contends the ALJ finding Dr. Mancini's opinion not persuasive because it was vague and unsupported is "incorrect because the evidence in the record both supported and was consistent with this opinion." (*Id*. at 13.) March claims the ALJ erred when she found Dr. Magleby's opinion somewhat persuasive but failed to include his opined psychological limitations. (*Id*. at 14-15.) March argues

if an ALJ's RFC conflicts with a medical source opinion, the ALJ must explain why the opinion was not adopted. (*Id*. at 15, citing *Kinney v. Comm'r Soc. Sec*., 2024 WL 2273365, *4 (6th Cir. May 20, 2024).) March claims the ALJ failed to include March's difficulty interacting with others in her RFC, which conflicts with Dr. Magleby's opinion. (*Id*.)

In response, the Commissioner argues the ALJ properly evaluated Dr. Mancini's opinion. (Doc. No. 7 at 10.) The Commissioner points out that Dr. Mancini filled out a Physical Medical Source Statement where he wrote "see functional capacity evaluation." (*Id*.) The Commissioner notes that, without more, the ALJ properly found that it was unclear whether Dr. Mancini endorsed Dr. McDonald's FCE or another examination, rendering an assessment of the opinion's consistency and supportability impossible. (*Id*. at 11.) The Commissioner argues March's assumption that Dr. Mancini referred to Dr. McDonald's FCE is not enough to overcome the ALJ's finding because substantial evidence supports the conclusion. (*Id*.)

Since March's claim was filed after March 27, 2017, the Social Security Administration's new regulations ("Revised Regulations") for evaluation of medical opinion evidence apply to this claim. *See Revisions to Rules Regarding the Evaluation of Medical Evidence (Revisions to Rules)*, 2017 WL 168819, 82 Fed. Reg. 5844 (Jan. 18, 2017); 20 C.F.R. § 404.1520c.

Under the Revised Regulations, the Commissioner will not "defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical findings, including those from your medical sources." 20 C.F.R. § 404.1520c(a). Rather, the Commissioner shall "evaluate the persuasiveness" of all medical opinions and prior administrative medical findings using the

17

factors set forth in the regulations: (1) supportability;[3] (2) consistency;[4] (3) relationship with the claimant, including length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship; (4) specialization; and (5) other factors, including but not limited to evidence showing a medical source has familiarity with the other evidence in the claim or an understanding of the agency's disability program's policies and evidentiary requirements. 20 C.F.R. § 404.1520c(a), (c)(1)-(5). However, supportability and consistency are the most important factors. 20 C.F.R. § 404.1520c(b)(2).

The Revised Regulations also changed the articulation required by ALJs in their consideration of medical opinions. The new articulation requirements are as follows:

> (1) Source-level articulation. Because many claims have voluminous case records containing many types of evidence from different sources, it is not administratively feasible for us to articulate in each determination or decision how we considered all of the factors for all of the medical opinions and prior administrative medical findings in your case record. Instead, when a medical source provides multiple medical opinion(s) or prior administrative medical finding(s), we will articulate how we considered the medical opinions or prior administrative medical findings from that medical source together in a single analysis using the factors listed in paragraphs (c)(1) through (c)(5) of this section, as appropriate. We are not required to articulate how we considered each medical opinion or prior administrative medical finding from one medical source individually.

> (2) Most important factors. The factors of supportability (paragraph (c)(1) of this section) and consistency (paragraph (c)(2) of this section) are the most important factors we consider when we determine how persuasive we find a medical source's medical opinions or prior administrative medical findings to be. Therefore, we will explain how we considered the supportability and consistency factors for a medical source's medical opinions or prior

---

[3] The Revised Regulations explain the "supportability" factor as follows: "The more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(1).

[4] The Revised Regulations explain the "consistency" factor as follows: "The more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

administrative medical findings in your determination or decision. We may, but are not required to, explain how we considered the factors in paragraphs (c)(3) through (c)(5) of this section, as appropriate, when we articulate how we consider medical opinions and prior administrative medical findings in your case record.

(3) Equally persuasive medical opinions or prior administrative medical findings about the same issue. When we find that two or more medical opinions or prior administrative medical findings about the same issue are both equally well-supported (paragraph (c)(1) of this section) and consistent with the record (paragraph (c)(2) of this section) but are not exactly the same, we will articulate how we considered the other most persuasive factors in paragraphs (c)(3) through (c)(5) of this section for those medical opinions or prior administrative medical findings in your determination or decision.

20 C.F.R. § 404.1520c(b)(1)-(3).

"Although the regulations eliminate the 'physician hierarchy,' deference to specific medical opinions, and assigning 'weight' to a medical opinion, the ALJ must still 'articulate how [he/she] considered the medical opinions' and 'how persuasive [he/she] find[s] all of the medical opinions.'" *Ryan L.F. v. Comm'r of Soc. Sec.,* No. 6:18-cv-01958-BR, 2019 WL 6468560, at \*4 (D. Ore. Dec. 2, 2019) (quoting 20 C.F.R. § 416.920c(a), (b)(1)). A reviewing court "evaluates whether the ALJ properly considered the factors as set forth in the regulations to determine the persuasiveness of a medical opinion." *Id.*

The ALJ analyzed the opinion of Dr. McDonald as follows:

Physical therapist James McDonald performed a functional capacity evaluation in March 2024. He opined, "Patient demonstrated the ability to perform within the SEDENTARY Physical Demand Category based on the definitions developed by the U.S. Department of Labor and outlined in the Dictionary of Occupational Titles. Based on sitting and standing abilities, patient may be able to work full time while taking into account his need to alternate sitting and standing as noted in this report. However, the unskilled sedentary occupational base is significantly eroded because he is unable to sit for approximately 6 hours of an 8-hour workday and sit at least 2 hours at one time. The patient lifted 20 pounds to below waist height. The patient lifted 10 pounds to shoulder height. The patient carried 10 pounds. Pushing abilities were evaluated and the patient pulled 22 horizontal force pounds and pushed 22 horizontal force pounds respectively. Non-material handling testing indicates the patient demonstrates an occasional tolerance for Bending, Fine Coordination, Gross Coordination, Simple Grasping, Stair Climbing and Walking. The patient demonstrated the ability to perform

19

Above Shoulder Reach, Forward Reaching and Pinching with frequent tolerance. The functional activities this patient should avoid within a competitive work environment include Static Balance, Firm Grasping and Squatting." Standing was limited to a maximum of 4 hours 17 minutes in a normal workday, and sitting was limited to 5 hours and 17 minutes in a normal workday. (8F/20-28; 9F/1-9) This opinion is from a non-treating source who is not a physician. It is only supported by the claimant's functioning during one exam. The opinion is only somewhat persuasive, because the longitudinal record is more consistent with the ability to lift and carry at a light level. The claimant's own testimony indicated that he could lift at a medium level until at least 2023, and that he continued to work in construction type jobs even in 2025. He has good strength and only mild carpal tunnel syndrome with good use of the hands. The undersigned finds that he could stand/walk for four hours and sit for four hours based on a history of joint pain, but normal gait at most visits. With these limits, a specific sit/stand time would not be required; however, the vocational expert stated that all jobs at step 5 would remain even if there were a sit/stand option. Reaching, use of the hands, and postural tasks were adjusted to be more consistent with the longitudinal exams. The undersigned also added reduced exposure to hazards.

(Tr. 29-30.)

In her analysis of the opinion of Dr. Linnean, the ALJ wrote:

Physical therapist Rebecca Lineann [sic] provided an assessment in February 2025, based on a one-time exam. She opined, "Mr. March demonstrated the ability to perform within the SEDENTARY Physical Demand Category based on the definitions developed by the U.S. Department of Labor and outlined in the Dictionary of Occupational Titles. Based on sitting and standing abilities, Mr. March may be able to work full time while taking into account his need to alternate sitting and standing as noted in this report. However, the unskilled sedentary occupational base is significantly eroded because he is unable to sit at least 2 hours at one time. Mr. March lifted 10 pounds to below waist height. Mr. March lifted 10 pounds to shoulder height. Mr. March carried 15 pounds. Non-material handling testing indicates Mr. March demonstrates an occasional tolerance for Above Shoulder Reach, Bending, Firm Grasping, Gross Coordination, Pinching, Simple Grasping, Stair Climbing and Walking. Mr. March demonstrated the ability to perform Forward Reaching and Fine Coordination with frequent tolerance. The functional activities Mr. March should avoid within a competitive work environment include Crawling, Repetitive Kneeling, Sustained Kneeling. Ladder/Other and Squatting." (25F/1-2) This opinion is from a non-treating source who is not a physician. They did not provide the clinical exam notes or other evidence to support the opinion. The undersigned agrees that there are some limits in the areas

> identified. However, the longitudinal record is more consistent with the residual functional capacity described in the heading of this section. Further, the available job base infringes on an issue reserved to the Commissioner. This opinion is minimally persuasive.

(*Id*. at 30.)

Supportability and consistency are the most important factors under the new regulations for evaluating medical source opinions. 20 C.F.R. § 404.1520c(a). The ALJ considered the supportability and consistency of Dr. McDonald's opinion, discussing how it is only supported by March's functioning during one exam. (Tr. 29.) The ALJ discussed how the record evidence did not support a sedentary activity level, but rather a light level, considering March's testimony concerning the amount of weight he could lift, his work in remodeling houses, and his demonstrated strength. (*Id*.)

The ALJ noted Dr. Linnean's assessment did not include any clinical examination notes or other evidence to support her opinion, rendering it impossible for the ALJ to assess whether Dr. Linnean's examination of March was supported her opinion. (*Id*. at 30.) "The Sixth Circuit has held that a medical opinion is 'patently deficient' when it involves 'check-box analysis...not accompanied by any explanation.'" *Skrzypiec v. Comm'r of Soc. Sec.,* No. 1:24-CV-00356-BMB, 2024 WL 4471122, at *9 (N.D. Ohio Oct. 11, 2024), *report and recommendation adopted,* No. 1:24-CV-00356, 2024 WL 4626237 (N.D. Ohio Oct. 30, 2024), citing *Hernandez v. Comm'r of Soc. Sec.*, 644 F.App'x 468, 474-75 (6th Cir. 2016). The ALJ considered the consistency of Dr. Linnean's opinion, noting that the record evidence, including unremarkable medical examinations and March's ability to perform remodeling work, does not support the level of limitation opined by Dr. Linnean. (*Id*.)

Plaintiff argues the ALJ's opinion is not supported by substantial evidence because the FCEs "were supported by and consistent with the testing and medical records along with the fact that the treating physician, Dr. Mancini, ordered and adopted the same. . ." (Doc. No. 6 at 10.) Here, the ALJ wrote nearly twelve single-spaced pages considering March's medical evidence. (Tr. 23-34.) While March would weigh

21

the evidence differently, it is not for the Court to do so on appeal. *See Her*, 203 F.3d at 389-90. There is no error.

The ALJ analyzed Dr. Mancini's opinion as follows:

> Primary care source Dr. Mancini provided a mental evaluation in January 2025. He sees the claimant twice per year for 20-30 minutes each time (40-60 minutes per year), and prescribes Adderall. He has also prescribed Prozac. He rated the claimant in a check-box form using ratings of unlimited/very good, limited but satisfactory, serious limited but not precluded, unable to meet competitive standards, or no useful ability to function. In the domain of concentration, persistence and pace, he check-marked limited but satisfactory in 3 areas; seriously limited but not precluded in 4 areas; and unable to meet competitive standards in 2 areas (complete normal workday/week and perform without unreasonable rest periods). In understanding and memory, he check-marked seriously limited but not preclude din all 3 areas. In social interaction, he check-marked limited by satisfactory in 2 areas, and seriously limited but not precluded in 3 areas. In adaptation, he check-marked seriously limited but not precluded in all 3 areas. He did not list any clinical or objective findings, or any other explanation for these ratings except to list diagnoses and the claimant's self-rating scores. He opined the claimant would miss 2-3 days of work per week, with no explanation. He opined the claimant would be off task for 50-100% of the workday, also with no explanation. (19F) This opinion does not use Agency recognized terms, and the five-option rating scale does not clearly correlate to recognized degrees of limitation. There is no narrative to indicate specific limits, and the check-box ratings alone are not sufficient to determine specific limits. There is no support for missing 2-3 days per week, as there is no explanation and the record shows the claimant has continued to work, and that he does not have any significant attendance issues for treatment. The suggestion of 50-100% time off task is wholly inconsistent with the ability to maintain attention for the entire one-hour hearing, the ability to plan, organize, and complete construction projects, or the ability to live independently while managing finances and medical appointments. There are several references to the claimant performing significant research into possible diagnoses and causes of his symptoms. Further, this source only spent 40-60 minutes with the claimant per year per his own reporting, which is not consistent with such a high level of limitations. For these reasons, the unsupported and vague opinion is not persuasive.

(Tr. 30-31.)

In her analysis of Dr. Magleby's opinion, the ALJ wrote, in part:

22

Based on the consultative exam described above, Dr. Magleby diagnosed PTSD, ADHD, and histrionic and antisocial traits. He opined, "1) The claimant's ability to understand, remember and carry out simple oral instructions is similar compared to other adults the same age based on this exam. On this exam the claimant has clearly shown the ability to follow the examiner's questions and directions, oral instructions on mental status and provide simple appropriate responses. Comprehension seemed average. Memory appeared average. The claimant's ability to follow more complex instructions or directions appeared to be fairly average for age expectations. 2) The claimant was not overly distracted on exam and seemed able to follow the procedures. The claimant's ability to maintain attention and concentration seemed more than adequate compared to other adults the same age. Persistence and pace in providing personal information and responses to mental status appeared fairly average compared to other adults the same age. The ability to perform a simple repetitive task, based on mental status and history, appeared fairly average. The ability to perform multi-step tasks appeared more than adequate for age expectation. 3) The claimant's ability to relate to others, such as, peers, fellow workers and/or supervisors has been somewhat impaired, which seems to be longstanding but why is unclear, and presently due mostly to PTSD symptoms along with what appear to be maladaptive personality traits. Any impulsivity related to ADHD also likely negatively affects his social interactions. Relationships with co-workers were usually "pretty good but it's me not being able to function because of my PTSD" and with supervisors "pretty good unless they were a bully." Socially, the claimant claimed that being around the public is uncomfortable "if I don't know some of the people, I'll have anxiety" due to "fear of experience traumatic memories, or another traumatic encounter." His social relating during this evaluation was not grossly impaired per se but some behaviors were inappropriate and suggestive of maladaptive personality traits. This is supported by reports of past social adaptive behaviors, past relationships, and current relationship and social history. 4) From a psychiatric standpoint, the claimant's ability to withstand the mental stress and pressures associated with day-to-day work activity appears to be mildly impaired at this time, mostly by PTSD and maladaptive personality traits. This is supported by the claimant's current mental complaints on this exam, psychiatric history and estimated adaptive behaviors at this time." (11F) This opinion is well supported by the explanation, and it is consistent with the findings on exam. However, it does not offer specific narrative regarding work related limits and abilities. There was a later diagnosis of autism spectrum disorder. Based on the newer evidence and lack of policy compliant language or specific abilities/ limitations (mildly, somewhat impaired is undefined), this opinion is only somewhat persuasive.

(*Id*. at 32-33.)

The ALJ considered the supportability and consistency of Dr. Mancini's opinion, discussing the mental evaluation provided. (*Id*. at 31.) The ALJ explained Dr. Mancini used a check box form, did not list any clinical or objective findings or any other explanation for his ratings, except to list diagnosis and March's self-rating scores. (*Id*.)  The ALJ noted Dr. Mancini also offered no explanation for his opinion that March would miss 2-3 days of work per week and would be off task for 50-100 percent of the workday. (*Id*.) The ALJ explained Dr. Mancini did not provide a narrative to explain specific limits. (*Id*.) The ALJ addressed consistency, noting there was no support in the record for March missing 2-3 days of work per week, as he continued to work and does not have significant attendance issues for treatment. (*Id*.) The ALJ explained that the opinion he would be off task 50-100 percent of the time is inconsistent with March's ability to maintain attention for an hour-long hearing, the ability to plan, organize, and complete construction projects, and live independently managing finances and medical appointment. (*Id*.) The ALJ also found Dr. Mancini's annual 40-60 minutes spent with March inconsistent with his suggested high-level limitations. (*Id*.) Here, the ALJ sufficiently discussed supportability and consistency of Dr. Mancini's opinion. There is no error.

The ALJ considered the supportability and consistency of Dr. Magleby's opinion, discussing that it is well supported by Dr. Magleby's explanation and his findings on examination. (*Id*. at 33.) The ALJ addressed consistency, explaining that there was a later diagnosis of autism. (*Id*.) The ALJ ultimately found the opinion somewhat persuasive because Dr. Magleby did not use policy compliant language or specific limitations, and due to the later autism diagnosis. (*Id*.) March argues the ALJ erred because when a medical opinion is found persuasive, the ALJ must include limitations from the persuasive review, or explain why the opinion was not adopted. (Doc. No. 6 at 15.) But here, the ALJ did explain that Dr. Magleby did not offer specific narrative regarding work related limits and abilities, and newer evidence includes an autism

diagnosis. (Tr. 33.) The ALJ properly considered the supportability and consistency of Dr. Magleby's opinion and offered sufficient explanation for not adopting his opinion in full. There is no error.

### B. Symptom Evaluation.

In his third assignment of error, March argues the ALJ failed to properly apply the criteria of SSR 16-3p. (Doc. No. 6 at 16.) March contends the ALJ failed to account for a combination of March's symptoms. (*Id.* at 18.) March claims the ALJ "failed to articulate any supportable rationale for his [sic] finding that Plaintiff's statements, as detailed above, were not entirely consistent with the medical evidence." (*Id.*) March maintains the ALJ's analysis was insufficient and not supported by substantial evidence. (*Id.*)

In response, the Commissioner argues the ALJ properly evaluated March's subjective complaints. (Doc. No. 7 at 11.) The Commissioner contends the ALJ thoroughly discussed the psychological examination by Dr. Holmes, the ALJ does not need to address every piece of evidence submitted, and March makes no clear argument as to why the ALJ's failure to discuss Dr. Holmes's specific statement require remand. (*Id.* at 12.)  The Commissioner points out the ALJ provided a thorough discussion of March's subjective complaints and explained that those complaints were not consistent with the record. (*Id.*) The Commissioner asserts March is requesting the Court reweigh the evidence, which is impermissible. (*Id.* at 13.)

A two-step process is used to evaluate an individual's symptoms. (20 CFR § 404.1529(c)(3), 416.929(c)(3); *Soc. Sec. Ruling 16-3p Titles II & XVI: Evaluation of Symptoms in Disability Claims*, SSR 16-3P (S.S.A. Oct. 25, 2017), 2017 WL 5180304.) At step one, the ALJ determines whether the individual has a medically determinable impairment that could reasonably be expected to produce the individual's alleged symptoms. (*Id.*; SSR 16-3p, 2017 WL 5180304 at *3.) At step two, the ALJ evaluates the intensity, persistence, and limiting effects of the claimant's symptoms. (*Id.* at *4.) "[O]bjective medical evidence is a

25

useful indicator to help make reasonable conclusions about the intensity and persistence of symptoms . . . [an ALJ] must consider whether an individual's statements about the intensity, persistence, and limiting effects of his or her symptoms are consistent with the medical signs and laboratory findings of record." (*Id.* at *5.)

An ALJ may consider the following factors when evaluating the intensity, persistence, and limiting effects of a claimant's symptoms:

1. Daily activities;
2. The location, duration, frequency, and intensity of pain or other symptoms;
3. Factors that precipitate and aggravate the symptoms;
4. The type, dosage, effectiveness, and side effects of any medication an individual takes or has taken to alleviate pain or other symptoms;
5. Treatment, other than medication, an individual receives or has received for relief of pain or other symptoms;
6. Any measures other than treatment an individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and
7. Any other factors concerning an individual's functional limitations and restrictions due to pain or other symptoms.

(*Id*. at *7-8.) An ALJ is not required to analyze all seven factors. *Pettigrew v. Berryhill*, No. 1:17-CV-01118, 2018 WL 3104229, at *16 (N.D. Ohio June 4, 2018), *report and recommendation adopted,* No. 1:17CV1118, 2018 WL 3093696 (N.D. Ohio June 22, 2018), citing *Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 733 (N.D. Ohio 2005).

In evaluating complaints of pain or other symptoms, an ALJ may properly consider the credibility of the claimant. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997), citing *Kirk v. Secretary of Health and Human Servs.,* 667 F.2d 524, 538 (6th Cir.1981), *cert. denied,* 461 U.S. 957, 103 S.Ct. 2428, 77 L.Ed.2d 1315 (1983). "[A]n ALJ's findings based on the credibility of the applicant are to be accorded great weight and deference, particularly since an ALJ is charged with the duty of observing a witness's demeanor and credibility." *Id*., citing *Villarreal v. Secretary of Health and Human Servs.,* 818 F.2d 461, 463 (6th Cir.1987). "Nevertheless, an ALJ's assessment of a claimant's credibility must be supported by

26

substantial evidence." *Id*. citing *Beavers v. Secretary of Health, Educ. and Welfare,* 577 F.2d 383, 386–87 (6th Cir.1978).

"An ALJ's determination of subjective evidence receives great deference on review." *Jones v. Comm'r of Soc. Sec. Admin.*, No. 1:21-CV-01257-DAC, 2022 WL 3155823, at *16 (N.D. Ohio Aug. 8, 2022), citing *Ulman v. Comm'r of Soc. Sec.,* 693 F.3d 709, 714 (6th Cir. 2012). "Absent compelling reason, this Court may not disturb the ALJ's analysis of the claimant's subjective complaints or the conclusions drawn from them." *Id*., citing *Baumhower v. Comm'r of Soc. Sec.*, No. 3:18-CV-0098, 2019 WL 1282105, at *2 (N.D. Ohio Mar. 20, 2019). "As long as the ALJ cited substantial, legitimate evidence to support his factual conclusions, we are not to second-guess[.]" *Ulman*, 693 F.3d at 713-14.

Here, the ALJ analyzed March's symptoms as follows:

> In written reports and testimony, the claimant alleged an inability to sustain full-time work to a combination of physical and mental symptoms. In 2020 and 2021, he could lift 30-50 pounds, and sometimes more. In 2023, he was still able to lift 30-50 pounds. He can currently sit for 20-60 minutes, and he can currently walk 60-80 feet. He had a biceps tendon surgery in June 2023. He underwent right knee surgery in October 2023. Since these surgeries, he reported that functioning reduced in general. He still has pain in the right knee from scar tissue. Left knee pain and instability fluctuates in intensity based on activity, sleep, stress, diet, and weather. There is pain in the hips and feet. The claimant uses a cane, but he does not need it every day. It is not prescribed. The claimant made the cane himself. There is pain in the shoulders and arms with numbness in the hands. It is difficult to button and zip, with some days being worse than others. The claimant drops things. The claimant can reach overhead, but he cannot do this all day. He can reach to the front and side depending on pain levels in the back and hips. The claimant has a shower chair, but it does not fit in his current shower. He testified that fatigue, pain and confusion prevent him from sustaining full-time work. He gets dizzy multiple times per day. He last passed out in 2023. The claimant takes Meloxicam, gabapentin, a muscle relaxer, and over the counter medications. He wears knee braces on most days.
>
> The claimant also reported mental limits. He stated that he is smart and that he is capable of doing skilled things. However, autism causes social limits. The claimant gets along with "good people," but he limits himself to brief interactions. He had issues with socialization in school. He was bullied, but he did have some friends. His teachers "loved him." The claimant is able to

27

> remember what tasks to do from day to day. He is able to drive. He has never been fired from a job. He stopped counseling. He takes Adderall.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

(Tr. 23-24.) The ALJ went on to extensively discuss March's medical history, including relatively unremarkable mental and physical examinations, extended gaps in treatment, improvement in his condition after successful surgeries, conservative mental health treatment, and extensive activities of daily living including work remodeling residential houses and driving for Door Dash. (*Id*. at 14-29.) The ALJ devoted nearly six single spaced pages to her evaluation, before considering the medical opinion evidence. (*Id*.)

The ALJ properly considered the objective medical evidence, including diagnoses, examination results, treatment effectiveness and lack of medication side effects. (*Id*.) Moreover, the ALJ discussed several of the factors set forth in SSR 16-3p for finding March's impairments not as debilitating as he alleged. (*Id*.) She considered March's testimony, activities of daily living, the location, frequency, and intensity of his symptoms, medication side effects or lack thereof, and scope of treatment. (*Id*.)

An ALJ must follow the two-step process for evaluating a claimant's symptoms and as part of that evaluation, an ALJ must consider whether the symptoms are consistent with the objective medical evidence and she did so here. SSR 16-3p, 2017 WL 5180304 at *5. Substantial evidence supports the ALJ's decision. See *Rogers,* 486 F.3d at 241. Given the high level of deference owed to an ALJ's findings with respect to the evaluation of a claimant's alleged symptoms and resulting limitations, under the circumstances presented herein, the court does not find the ALJ's symptom analysis was insufficient. There is no error.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be AFFIRMED.

Date: June 3, 2026

       *s/ Jonathan Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

### OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may forfeit the right to appeal the District Court's order.  *Berkshire v. Beauvais*, 928 F.3d 520, 530-31 (6th Cir. 2019).**

29